

2015 MAR -2 AM 9: 47

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

TRUDY M. DAVIS, a single person )
           )  DIVISION ONE
     Appellant,     )
           )  No. 71090-7-I
     v.         )
           )  UNPUBLISHED OPINION
THE BLACKSTONE CORPORATION, )
successor trustee; and MICHAEL E. )
MENASHE, whose marital status is )
unknown,         )
           )
     Respondents.    )  FILED: March 2, 2015
           )

DWYER, J. — Trudy Davis obtained a $250,000 loan from Michael Menashe. The loan was evidenced by a promissory note that was secured by a deed of trust, which was recorded against residential real estate owned by Davis. After Davis refused to make scheduled interest payments, a nonjudicial foreclosure was initiated against her property. Davis filed suit to enjoin the foreclosure sale, claiming that the loan was usurious. Concluding that Davis was unlikely to prevail on the merits, the trial court refused to enjoin the sale. Thereafter, the trial court found that Davis's purpose for the loan was primarily a business purpose and, as a result, granted summary judgment against her and dismissed her claims. We conclude that the foreclosure sale should have been

enjoined, and that summary judgment was improperly granted. Therefore, we reverse and remand for further proceedings consistent with this opinion.

I

In early November 2011, Davis obtained a loan from Menashe. The loan was arranged by a loan broker named Michael Knapp. The loan was evidenced by a promissory note, which was secured by a deed of trust that was recorded against residential real estate owned by Davis in King County. Knapp's letter confirming the terms of the loan stated, in pertinent part, that the loan amount was $250,000, that the interest rate of the loan was 11.5 percent, and that the lender, Menashe, would charge a 6 percent fee. In addition, Knapp's handwritten notes describing the loan sought by Davis contained the following statement: "Needs money to live, build up reserves and to rehab Seattle prop for business/rental cash flow."

The promissory note authorized Menashe to withhold $12,500 as a "repair reserve" and $16,770.83 as an "interest reserve." Following satisfactory completion of certain repairs to Davis's property described in the deed of trust, Davis was permitted to request disbursements from the "repair reserve." The "interest reserve" was to be used, under certain circumstances, to cover Davis's monthly interest payments.

In closing the transaction, Menashe wired into escrow $210,729.27— rather than the $250,000 face amount of the loan. Also at closing, the title insurance company issued a document entitled, "Borrower's Final Settlement Statement." Therein, under the heading "New Loan(s)," certain charges pertinent

to this appeal were listed.

- Our origination charge – Michael E. Menashe      $10,000.00
- Loan fee – Michael E. Menashe      $ 5,000.00
- Underwriting fee – Michael E. Menashe      $ 1,195.00
- Loan Processing Fee – Universal Financial LLC      $ 1,500.00
- Mtg Fee – Columbia Mortgage      $ 2,500.00

**TOTAL**      **$20,195.00**

Loan proceeds in the amount of $198,999.89 were distributed to various parties. The bulk of the loan, $147,721.18, was distributed to a man named Greg Yamate. This amount was disbursed to Yamate because Davis wished to loan the same amount to Lowell Ing—a man to whom she had previously loaned money—who, in turn, wished to relend the same amount to Yamate. Therefore, Davis arranged to have the amount disbursed directly to Yamate.

A lesser amount, $25,809.27, was distributed to King County in order to pay delinquent taxes, interest, and penalties on Davis's property in King County.

Additionally, $9,474.44 was used to pay off a loan that Davis had obtained in connection with the acquisition of the real property against which the deed of trust had been recorded.

Finally, the remainder of the proceeds, $15,995, was distributed to Davis.

Following disbursal, Davis made no interest payments pursuant to the promissory note. However, funds from the interest reserve were disbursed monthly on her behalf and were applied to her monthly interest payment of $2,276.04. The interest reserve was exhausted in July 2012. Davis still did not make any interest payments. Instead, Davis, through her counsel, informed Menashe's counsel that she believed the interest rate on the loan to be usurious.

Menashe appointed the Blackstone Corporation as "successor trustee" under the deed of trust. The Blackstone Corporation then commenced a nonjudicial deed of trust foreclosure on Davis's property against which the deed of trust had been recorded. The foreclosure sale date was set for February 22, 2013.

On January 30, 2013, Davis filed an action in King County Superior Court seeking to enjoin the nonjudicial foreclosure pursuant to the Washington deeds of trust act[1] (DTA). She averred that the nonjudicial foreclosure was improperly commenced because, owing to the allegedly usurious loan, the foreclosure was based on incorrectly calculated sums owing. She pleaded violations of Washington's usury act[2] and Washington's Consumer Protection Act (CPA),[3] and sought a declaratory judgment.

On March 15, 2013, at a hearing on Davis's motion seeking a temporary restraining order, the superior court judge, in an oral ruling, denied Davis's request to enjoin the sale, but granted her 30 days to appeal. The trial court also ruled that the foreclosure sale was to be postponed to allow Davis to file an appeal and post a supersedeas bond.

Following the superior court's oral ruling, but prior to entry of a written order, the Blackstone Corporation abandoned the foreclosure sale. It did so due to its discovery that "figures used in the contested non-judicial foreclosure were incorrect." However, the Blackstone Corporation stated its intent "to re-

---

[1] Ch. 61.24 RCW.
[2] Ch. 19.52 RCW.
[3] Ch. 19.86 RCW.

- 4 -

commence the non-judicial foreclosure process and issue an amended notice of default."

Owing to this abandonment, Davis argued to the trial court that the issue had been mooted. Menashe disagreed, arguing that Davis "offers no authority for the extraordinary proposition that an oral ruling on a plainly justiciable issue should not be preserved in the record by the entry of an order memorializing that ruling."

Subsequently, the court entered a written order memorializing its oral ruling, therein concluding that, "the Court deems Plaintiff unlikely to prevail on the merits of her usury defense at trial."

Following its recalculation of the amount purportedly owed by Davis, the Blackstone Corporation set a new sale date of August 16, 2013.

Thereafter, Menashe and Davis filed cross motions for summary judgment. On June 21, at a hearing on the cross motions, the court denied Davis's motion and granted Menashe's motion. The "tentative" basis for the court's oral ruling was the judge's conclusion that the rate of the loan was not usurious.

Davis moved for reconsideration, which was denied. However, in denying the reconsideration motion, the court amended its summary judgment ruling so as to provide a different justification therefor than that which had been given at the hearing: "Defendant is entitled to judgment as a matter of law, because Washington law governs the question of whether the loan at issue is usurious, and the loan is exempt from that state's usury restrictions because the loan was

taken primarily for commercial, investment, or business purposes." Davis's claims were then dismissed.

On July 18, Davis moved, pursuant to RCW 61.24.090(2), for a determination of the amount of fees she would be required to pay in order to reinstate the loan. Rather than providing Davis a judgment declaring the reinstatement amount, the superior court entered a money judgment in Menashe's favor, awarding him $131,678.90. Apparently feeling unshy about his good fortune, Menashe then moved for reconsideration, arguing that the judgment improperly deferred postjudgment interest to the date of the foreclosure sale. His motion for reconsideration was granted and the judgment amended to authorize postjudgment interest from the date that the judgment had been entered.

On August 15, Davis obtained a supersedeas order by which the foreclosure process was stayed pending appeal.

After Davis filed an opening brief in this court, Menashe filed a motion to affirm on the merits pursuant to RAP 18.14. Because we no longer utilize the motion on the merits procedure,[4] a commissioner of this court permitted Menashe to file a brief of respondent but provided that, in the event that he chose not to avail himself of this opportunity, his motion on the merits to affirm would be treated as the brief of respondent. Menashe did not file a respondent's brief.

---

[4] Due to budget cut-backs, Division One reduced its number of court commissioners from four to one between 2009 and 2013. A second commissioner was added in September 2013. As a result of these changes, Division One at first revised and later abandoned entirely the motion on the merits procedure. See, e.g., General Order of August 18, 2014 (memorializing Division One's renunciation of the RAP 18.14 procedure).

II

Davis first contends that the trial judge erred in refusing to enjoin the sale of her property. Davis maintains that, in considering whether to issue an injunction, the judge mistakenly considered the likelihood that Davis would prevail on the merits of her usury defense. Once she raised the defense of usury, Davis argues, she was entitled, pursuant to the DTA, to have the foreclosure sale restrained. We agree.

Statutory interpretation is a question of law that we review de novo. HomeStreet, Inc. v. Dep't of Revenue, 166 Wn.2d 444, 451, 210 P.3d 297 (2009). The primary objective of statutory interpretation is "'to ascertain and carry out the intent of the Legislature.'" HomeStreet, 166 Wn.2d at 451 (quoting Rozner v. City of Bellevue, 116 Wn.2d 342, 347, 804 P.2d 24 (1991)).

In the DTA, the legislature prescribed a specific procedure for obtaining injunctive relief from nonjudicial foreclosure. See RCW 61.24.130. Notably, the legislature stated, "Nothing contained in this chapter shall prejudice the right of the borrower . . . to restrain, on any proper legal or equitable ground, a trustee's sale." RCW 61.24.130(1) (emphasis added). However, the legislature authorized courts to "condition granting the restraining order or injunction upon the giving of security by the applicant" for payment of damages suffered as a result of a restraining order being granted. RCW 61.24.130(1)(b).

Menashe points out that Civil Rule 65 contains a general procedure for obtaining injunctive relief. While this is so, the rule is "intended to supplement and not to modify any statute prescribing the basis for obtaining injunctive relief."

CR 65(e). Hence, when the legislature has prescribed a means of obtaining injunctive relief, CR 65 may not negate the will of the legislature.

The dispute herein turns on the proper showing that must be made by an applicant seeking to restrain a nonjudicial foreclosure sale. Citing the absence of prior interpretations of RCW 61.24.130(1), the trial judge required a showing by Davis that she was likely to prevail on the merits—the same showing that must be made in order for a restraining order to issue pursuant to CR 65. San Juan County v. No New Gas Tax, 160 Wn.2d 141, 154, 157 P.3d 831 (2007). Challenging the trial court's reliance on CR 65, Davis maintains that, in order to obtain injunctive relief pursuant to the DTA, she needed only to assert a "proper legal or equitable ground." She contends that this showing was made when she raised the defense of usury.

It is understandable that, in the absence of precedent interpreting RCW 61.24.130(1), the trial judge turned to the familiar CR 65 standard. Nevertheless, the court erred in so doing. The accommodating language used by the legislature in the DTA—"any proper legal or equitable ground"—is at odds with the CR 65 requirement of showing a likelihood of prevailing on the merits.[5] The use of accommodating language signals the legislature's intent to lighten the load of those already burdened by the prospect of losing their home—an intent that has been recognized and reaffirmed by our Supreme Court.

---

[5] Ordinarily, this would occasion a conflict analysis. See, e.g., Putman v. Wenatchee Valley Med. Ctr., P.S., 166 Wn.2d 974, 979-85, 216 P.3d 374 (2009). However, CR 65(e) plainly states, "These rules are intended to supplement and not to modify *any statute prescribing the basis for obtaining injunctive relief.*" Because RCW 61.24.130 prescribes a basis for obtaining injunctive relief, it is not, by the plain language of CR 65(e), displaced by the court rule.

Indeed, our Supreme Court "has frequently emphasized that the deed of trust act 'must be construed in favor of borrowers because of the relative ease with which lenders can forfeit borrowers' interests and the lack of judicial oversight in conducting nonjudicial foreclosure sales.'" Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 789, 295 P.3d 1179 (2013) (quoting Udall v. T.D. Escrow Servs., Inc., 159 Wn.2d 903, 915-16, 154 P.3d 882 (2007)). After all, "[t]he power to sell another person's property, often the family home itself, is a tremendous power to vest in anyone's hands," and "[t]rustees have considerable financial incentive to keep those appointing them happy and very little financial incentive to show the homeowners the same solicitude." Klem, 176 Wn.2d at 789. This accommodation for borrowers facing property loss is a legislative analog to the time-honored tradition of Washington courts protecting property from misappropriation through means of the judicial process. Klem, 176 Wn.2d at 790 n.10 ("When 'a jury . . . returned a verdict which displeased [Territorial Judge J.E. Wyche] in a suit over 160 acres of land' he threatened to set aside their verdict and remarked, 'While I am judge it takes thirteen men to steal a ranch.'" (alterations in original) (quoting 2 Wilfred A. Airey, A History of the Constitution and Government of Washington Territory, at 312 (June 5, 1945) (unpublished Ph.D. thesis available in the Washington State Library, Olympia, Washington))).

The purpose of RCW 61.24.130 is to allow property owners to restrain a sale in order to allow for a decision on the merits following an opportunity for discovery and fact-finding. By requiring merely a showing of "any legal or equitable ground" as the basis for an injunction to issue, the legislature provided

property owners in default with an opportunity to prevent the loss of their home, if only temporarily, without needing to first marshal sufficient evidence to show a likelihood of prevailing on the merits. By permitting courts to require security from an applicant seeking an injunction, the legislature provided a deterrent against dilatory or duplicitous tactics designed only to frustrate the purposes of the nonjudicial foreclosure process, particularly those of efficiency and economy. The statutory scheme reflects a careful calibration of conflicting values that would be disturbed were the required showing under CR 65 superimposed upon it. We hold, therefore, that Davis was not required to show a likelihood of prevailing on the merits but, rather, merely had to assert any proper legal or equitable ground to obtain an order restraining the sale.

Consequently, we are left to inquire only whether the defense of usury constitutes a proper ground for restraint. While the DTA "does not define what constitutes proper grounds for restraint," the language used in the statute "suggests a broad scope," including "'defenses to the default(s) such as payments having been made, lender liability issues, fraud, *usury*, violation of truth in lending and consumer protection laws.'" Vawter v. Quality Loan Serv. Corp. of Wash., 707 F. Supp. 2d 1115, 1122 (W.D. Wash. 2010) (emphasis added) (quoting 27 MARJORIE DICK ROMBAUER, WASHINGTON PRACTICE: CREDITORS' REMEDIES—DEBTORS' RELIEF § 3.62 (2008)). We agree that usury is a proper ground for restraint. Therefore, once Davis asserted the defense of usury, it was incumbent upon the trial court to restrain the foreclosure sale. Accordingly, on remand, so long as Davis complies with all other statutory

- 10 -

requirements, the trial court should restrain the foreclosure sale, pending ultimate disposition of this matter.

III

Davis next contends that the adverse grant of summary judgment was made in error. She asserts that genuine issues of material fact existed regarding both the issue of whether the loan exceeded the permissible interest rate for consumer loans and the issue of whether the loan was taken primarily for business purposes. We agree.

We review a grant of summary judgment de novo. Lokan & Assocs., Inc. v. Am. Beef Processing, LLC, 177 Wn. App. 490, 495, 311 P.3d 1285 (2013). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Am. Express Centurion Bank v. Stratman, 172 Wn. App. 667, 673, 292 P.3d 128 (2012). We consider the evidence and the reasonable inferences therefrom in the light most favorable to the nonmoving party. Stratman, 172 Wn. App. at 673. A genuine issue of material fact exists where reasonable minds could differ regarding the facts controlling the outcome of the litigation. Parks v. Fink, 173 Wn. App. 366, 374, 293 P.3d 1275, review denied, 177 Wn.2d 1025 (2013).

In order to establish the defense of usury, the following elements must be proved by a preponderance of the evidence: (1) a loan or forbearance, express or implied, of money or other negotiable tender; (2) an understanding between the parties that the principal must be repaid; (3) the exaction of a greater rate of interest than is allowed by law; and (4) an intention to violate the law—that is, an

intention merely to enter into the transaction. Liebergesell v. Evans, 93 Wn.2d 881, 887, 613 P.2d 1170 (1980); Metro Hauling, Inc. v. Daffern, 44 Wn. App. 719, 721, 723 P.2d 32 (1986). Only the third element is at issue in this matter. Yet, two inquiries, each encompassed within the third element, must be made in order to determine whether summary judgment was properly granted: (A) was the loan usurious, and, if so, (B) was it primarily for business purposes?

## A

The usury act sets a maximum rate of 12 percent interest that may be charged on a loan.[6]

> **Highest rate permissible—Setup charges.** (1) Any rate of interest shall be legal so long as the rate of interest does not exceed the higher of: (a) Twelve percent per annum; . . . No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action.

RCW 19.52.020.

"A lender may not evade the usury laws by executing a note which is nonusurious on its face while actually disbursing less than the principal amount of the note." Sparkman & McLean Income Fund v. Wald, 10 Wn. App. 765, 768,

---

[6] To be more specific, the usury act permits any rate of interest so long as it does not exceed the higher of 12 percent or
> (b) four percentage points above the equivalent coupon issue yield (as published by the Board of Governors of the Federal Reserve System) of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the later of (i) the establishment of the interest rate by written agreement of the parties to the contract, or (ii) any adjustment in the interest rate in the case of a written agreement permitting an adjustment in the interest rate.

RCW 19.52.020(1)(b).
   Neither party has ventured to determine whether the yield of subsection (1)(b) exceeded 12 percent at the time the note was executed. In the absence of evidence from either party that the latter exceeded the former at that time, we presume that 12 percent represented the maximum permissible interest rate.

520 P.2d 173 (1974). In calculating whether a loan is usurious, courts "will look behind subterfuge, devices and evasions by which the real rate of interest contracted for or reserved may be hidden." Busk v. Hoard, 65 Wn.2d 126, 135, 396 P.2d 171 (1964); accord Home Sav. & Loan Ass'n v. Sanitary Fish Co., 156 Wash. 80, 91, 286 P. 76 (1930). "Though not conclusive in all instances, the most reliable test for usury . . . is to compare the amount of money actually received with the amount of money the borrower is obliged to repay, adding thereto whatever additional charges are imposed upon the borrower for the use of the money." Busk, 65 Wn.2d at 135.

"A charge for interest is not part of the loan transaction, regardless of what the parties may call the charge." Aetna Fin. Co. v. Darwin, 38 Wn. App. 921, 926, 691 P.2d 581 (1984) (citing Sparkman & McLean, 10 Wn. App. at 768). Charges for interest include "[c]harges for making a loan and for the use of money." Aetna, 38 Wn. App. at 926 (citing Testera v. Richardson, 77 Wash. 377, 379, 137 P. 998 (1914); Sparkman & McLean, 10 Wn. App. at 768). However, "charges are not interest if they are for services actually provided by the lender, reasonably worth the price charged, and for which the borrower agreed to pay." Aetna, 38 Wn. App. at 926. "Although not dispositive, the fact that . . . services were obtained by payment to a third party is evidence the services were actually provided to the borrower and were reasonably worth the amount charged." Aetna, 38 Wn. App. at 926 n.5. Whether a charge represents "interest or legitimate costs of the loan" is a question of fact. Sparkman & McLean, 10 Wn. App. at 768; accord Buckley v. Stevens, 3 Wn. App. 593, 594-95, 476 P.2d 724

(1970).

Davis contends that the following charges, which were all listed in the "Borrower's Final Settlement Statement" issued by the title company at closing, are properly characterized as interest.

| | |
|---|---|
| • Our origination charge – Michael E. Menashe | $10,000.00 |
| • Loan fee – Michael E. Menashe | $ 5,000.00 |
| • Underwriting fee – Michael E. Menashe | $ 1,195.00 |
| • Loan Processing Fee – Universal Financial LLC | $ 1,500.00 |
| • Mtg Fee – Columbia Mortgage | $ 2,500.00 |
| **TOTAL** | **$20,195.00** |

Based on the deposition testimony of Knapp and Menashe, it is apparent that the $10,000 charge and the $5,000 charge corresponded to the 6 percent "Lender's Fee" listed in Knapp's letter confirming the terms of the loan. As detailed in their testimony, Knapp and Menashe split this 6 percent fee such that Knapp received $5,000 and Menashe received $10,000. For his part, Knapp stated that the fee was paid in exchange for "Operating a business." Neither party has identified the services provided by Menashe in exchange for the $10,000 charge.

Knapp testified that the "Underwriting fee" of $1,195 represents "[t]he energy and effort it takes to underwrite to determine the viability of a transaction is the underwrite. So determining the value of the property." Davis, on the other hand, testified that she did not agree to the "Underwriting fee" charge and did not receive services in exchange for payment. In addition, the fee was not listed on the term sheet that she signed.

Menashe testified that he did not know to what the $1,500 "Loan

Processing Fee" referred. Davis testified that she did not agree to the "Loan Processing Fee" and did not receive services in exchange for payment. In addition, the fee was not listed on the term sheet that she signed.

Neither Menashe nor Knapp knew to what the $2,500 "Mtg Fee" charge referred. Davis testified that she did not agree to the "Mtg Fee" charge and did not receive services in exchange for payment. In addition, the fee was not listed on the term sheet that she signed.

The foregoing evidence, all of which was before the trial court, demonstrates that there were genuine issues of material fact concerning whether the fees that Davis was charged represented interest or legitimate costs of the loan. Davis was entitled to have a finder of fact determine whether the fees were setup charges that were incidental to the loan, or whether they were services for which she agreed to pay and for which she received actual value. See Aetna, 38 Wn. App. at 926. In the event that these charges are excluded from the principal of the loan, as calculated by Davis, the interest rate of 12.57 percent exceeds that which is permitted by the usury act.[7]

B

Davis presented sufficient evidence to withstand summary adjudication on the question of whether the interest rate exceeded that which may be charged for consumer loans. However, the trial court, as indicated in its written order granting summary judgment, ruled against Davis because it concluded that the

---

[7] In fact, when the charges are added to the nominal interest charged, the rate, as calculated by Davis, increases to 18.76 percent.

loan was primarily for business purposes and was, therefore, exempt from the maximum interest rate for consumer loans set forth in the usury act.

The 12 percent maximum interest rate in the usury act is subject to a statutory exemption for certain transactions.

> **Defense of usury or maintaining action thereon prohibited if transaction primarily agricultural, commercial, investment, or business—Exception.** Profit and nonprofit corporations, Massachusetts trusts, associations, trusts, general partnerships, joint ventures, limited partnerships, and governments and governmental subdivisions, agencies, or instrumentalities may not plead the defense of usury nor maintain any action thereon or therefor, and persons may not plead the defense of usury nor maintain any action thereon or therefor if the transaction was primarily for agricultural, commercial, investment, or business purposes: PROVIDED, HOWEVER, That this section shall not apply to a consumer transaction of any amount.
>
> Consumer transactions, as used in this section, shall mean transactions primarily for personal, family, or household purposes.

RCW 19.52.080.

It is well settled that "a loan's 'purpose' in the context of RCW 19.52.080 is principally established by the representations the borrower makes to the lender at the time the loan is procured." Brown v. Giger, 111 Wn.2d 76, 82, 757 P.2d 523 (1988); cf. Jansen v. Nu-West, Inc., 102 Wn. App. 432, 440, 6 P.3d 98 (2000) (observing that, although not dispositive, the fact that loan proceeds were actually used for business purposes may be persuasive evidence). "The lender's purpose for the loan, which almost always is a business purpose, is irrelevant." Aetna, 38 Wn. App. at 928. "When a loan is usurious on its face, the burden is on the lender to show the business exception applies." Marashi v. Lannen, 55 Wn. App. 820, 823, 780 P.2d 1341 (1989).

- 16 -

"Washington cases consistently have noted the importance of objective indications of purpose in determining the applicability of the 'business purpose' exemption." Brown, 111 Wn.2d at 82. "[W]hen other representations of the borrowers are inconclusive, written statements in the loan documents may be dispositive." Marashi, 55 Wn. App. at 824. A direct conflict in the evidence on the issue of the loan's purpose, however, will normally create an issue for the trier of fact. Marashi, 55 Wn. App. at 824. "Determination of the purpose is for the jury, and the question of whether that purpose constitutes a business purpose is a question of law to be decided by the court." Marashi, 55 Wn. App. at 824 n.3. Put differently, while "[a] jury decides the factual question of what the parties understood the funds were going to be spent on," it is for the court to "decide as a matter of law whether the[] proposed expenditures constitute business purposes." Jansen, 102 Wn. App. at 441.

Menashe contends that the trial court did not improperly resolve issues of material fact and that, as a matter of policy, Davis is not the type of borrower the usury laws were designed to protect. We are not persuaded by either contention.

Davis has consistently maintained that the purpose of the loan was personal. She stated that her intent was to pay off a prior loan on the property in King County, pay taxes on the same property, and make a personal loan to Lowell Ing. Her position is supported by the averments contained in Ing's declaration, including his statement that Davis provided him with an interest free loan, the principal of which he then loaned to Greg Yamate. Her position is also supported by Michael Knapp's handwritten note, in which he stated that Davis

- 17 -

"[n]eeds money to live, build up reserves and to rehab Seattle prop for business/rental cash flow."

This evidence, considered together, creates genuine issues of material fact necessitating resolution by a fact finder. Given that the bulk of the loan proceeds were devoted to the purportedly interest free loan, it could reasonably be inferred that the primary purpose of the loan was personal. Moreover, Davis's statement, "[n]eeds money to live," is evidence suggesting a personal purpose for the loan.

Nevertheless, Menashe asserts that Davis's act of relending the bulk of the loan proceeds shows that the purpose of the loan was primarily business in nature. In an effort to support his assertion, Menashe quotes misleadingly from Aetna: "a lender's purpose for making a loan 'almost always is a business purpose[.]'" Respondent's Motion on the Merits to Affirm at 14 (quoting Aetna, 38 Wn. App. at 928). The principle actually set forth in Aetna is this: "The lender's purpose for the loan, which almost always is a business purpose, *is irrelevant.*" 38 Wn. App. at 928 (emphasis added). Aetna does not vindicate Menashe's position.[8]

Menashe also relies on our Supreme Court's decision in Brown. Read closely, Brown does not assist Menashe. In Brown, the borrower signed loan documents that contained, in at least three separate places, statements

---

[8] Moreover, in citing to Aetna, Menashe confounds the role of the parties to the loan at issue. With regard to Menashe's loan to Davis, Menashe is the lender and Davis is the borrower. Thus, Davis's purpose—to subsequently make a no-interest, personal loan to Ing—*is* relevant and is *not* the intent of the *lender* in the transaction at issue. Davis is not a "lender" as discussed in Aetna.

- 18 -

describing the loan as having a business or commercial purpose. 111 Wn.2d at 82-83. The court's decision was quite clearly rooted in the descriptions contained in the loan documents. Yet, as a coda to its holding, the court observed, "[the borrower] did not need the money she borrowed and, in fact, never personally controlled or expended it in any way." Brown, 111 Wn.2d at 83. This observation is dicta; it does not vindicate Menashe's position.

Menashe's policy argument—that usury laws are not designed to protect sophisticated borrowers such as Davis—does not obviate the need for fact finding. Because there are factual disputes in need of resolution, summary judgment was improperly granted.[9]

## IV

Davis next contends that the trial court erred by entering an enforceable money judgment in favor of Menashe prior to a foreclosure sale occurring. Davis asserts that RCW 61.24.090(2) does not empower trial courts to enter money judgments but, rather, authorizes only a determination of the reasonableness of any fees demanded or paid as a condition to reinstatement of a loan.

RCW 61.24.090(2) provides for the following:

> Any person entitled to cause a discontinuance of the sale proceedings shall have the right, before or after reinstatement, to request any court, excluding a small claims court, for disputes within the jurisdictional limits of that court, to determine the reasonableness of any fees demanded or paid as a condition to

---

[9] Davis also maintains that her CPA claim, which was dismissed on summary judgment, should be reinstated. This is so, she asserts, because her theory was that a violation of the usury act constitutes a per se violation of the CPA. Given that the trial court did not indicate any independent basis for dismissing Davis's CPA claim, Davis's contention is well-taken. Accordingly, we reverse the dismissal of Davis's CPA claim.

reinstatement. The court shall make such determination as it deems appropriate, which may include an award to the prevailing party of its costs and reasonable attorneys' fees, and render judgment accordingly. An action to determine fees shall not forestall any sale or affect its validity.

Pursuant to RCW 61.24.090(2), Davis, as a "borrower," was entitled to request that the trial court "determine the reasonableness of any fees demanded or paid as a condition to reinstatement" of the loan. When she exercised her right to do so, the trial court granted her motion to determine the loan reinstatement fees. However, when Menashe requested that the court enter a money judgment against Davis and in his favor for "reasonable foreclosure and litigation expenses and judgment," the court honored his request and entered a "reinstatement judgment" against Davis. Subsequently, Menashe sought and obtained from the court an amendment to the reinstatement judgment allowing him to collect interest on the amount awarded.

Davis argues that RCW 61.24.090 contains a method of determining reasonable foreclosure fees for the purpose of reinstating a loan, not for collecting a money judgment that bears interest incident to the reinstatement of a loan. By entering a money judgment in favor of Menashe, Davis contends, the court created a potential deficiency judgment, which is prohibited by RCW 61.24.100(1): "Except to the extent permitted in this section for deeds of trust securing commercial loans, a deficiency judgment shall not be obtained on the obligations secured by a deed of trust against any borrower, grantor, or guarantor after a trustee's sale under that deed of trust."

Davis asks, therefore, that we vacate the reinstatement judgment and its

- 20 -

amendment. However, based on the manner in which we have resolved the preceding issues, and owing to the lack adversarial briefing on this particular issue, it is unnecessary and undesirable for us to decide it herein.

V

Finally, Davis requests an award of attorney fees and costs on appeal pursuant to the DTA, the usury act, the promissory note, and the deed of trust. She asserts that, as the substantially prevailing party on appeal, she is entitled to recover both costs and fees.

Pursuant to RAP 14.2, a party that "substantially prevails" on appeal is entitled to recover costs. Where the dismissal of a party's claim as a result of summary judgment is reversed on appeal, costs may be awarded. See, e.g., Sorrel v. Eagle Healthcare, Inc., 110 Wn. App. 290, 300, 38 P.3d 1024 (2002). However, "[w]here a party has succeeded on appeal but has not yet prevailed on the merits," an award of attorney fees should abide the ultimate resolution of the issues in the case. Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 153, 94 P.3d 930 (2004).

Davis is the substantially prevailing party on appeal and, therefore, is entitled to recover costs. However, because the merits of her claims have yet to be adjudicated to completion, her fee request must abide ultimate resolution of the lawsuit.

Reversed and remanded.

We concur: